**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

AMANDA D. MARTIN,

Plaintiff,

-vs-

DECISION & ORDER
09-CV-6617-CJS

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

Defendant.

---

**APPEARANCES**

For Plaintiff: Irving Pheterson, Esq.
Pheterson & Pheterson
One East Main St. Suite 1000
Rochester, NY 14614
(585) 546-5600

For Defendant: Michael H. Bernstein, Esq.
John Thomas Seybert, Esq.
Sedgwick, Detert Moran & Arnold
125 Broad Street 39th Floor
New York, NY 10004
(212) 422-0202

**INTRODUCTION**

**Siragusa, J.** This Employee Retirement Income Security Act (ERISA) case is before the Court on Plaintiff's motion for summary judgment (Docket No. 15), Defendant's cross-motion for summary judgment (Docket No. 15) and Defendant's motion to strike (Docket No. 24). For the reasons stated below, the Court finds that Defendant's decision to deny accidental death benefits to the decedent under the exclusion provision was not arbitrary

and capricious. Defendant's motion to strike and cross-motion for summary judgment are granted and Plaintiff's motion for summary judgment is denied.

**FACTUAL BACKGROUND**

The following factual background is taken from the parties' statements of fact. Plaintiff Amanda D. Martin ("Martin") is the widow of Paul A. Martin ("Decedent"), who died on December 13, 2008, as a result of electrocution. Decedent had been employed at the time of his death by MKS Instruments, Inc. ("MKS") as an electrical engineer. MKS provided insurance to Decedent through its "Group Long Term Disability, Basic Term Life, Supplemental Dependent Life, Supplemental Term Life, Basic Accidental Death and Dismemberment, Supplemental Accidental Death and Dismemberment Plan for Employees of MKS INSTRUMENTS, INC." (the "MKS Plan" or "Plan"). Benefits under the MKS Plan were funded by Hartford Life and Accident Insurance Company ("Hartford") through its group policy GL/GLT-677074, effective April 1, 2007 ("the Policy"). MKS was the plan administrator for the Plan and Hartford was the claim administrator for the Plan.

The plan contained a provision for payment of benefits in the case of accidental death or dismemberment, the language of which stated in pertinent part as follows:

> When is the Accidental Death and Dismemberment Benefit payable?
>
> If You or Your Dependents sustain an Injury which results in any of the following Losses within 365 days of the date of accident, We will pay the injured person's amount of Principal Sum, or a portion of such Principal Sum, as shown opposite the Loss after We receive Proof of Loss, in accordance with the Proof of Loss provision.

(Martin 000051[1] (Docket No. 17-3).) The Plan also contains an exclusion provision, which states:

> Exclusions: (applicable to all benefits except the Life Insurance, Accelerated Benefit): What losses are not covered?
>
> The Policy does not cover any loss caused or contributed to by:
>
> 1) intentionally self-inflicted Injury.…

(Martin 000057 (Docket No. 17-3).) It also contains a definition of Injury: "Injury means bodily injury resulting: 1) directly from an accident; and 2) independently of all other causes; which occurs while You or Your Dependents are covered under The Policy." (Martin 000062 (Docket No. 17-3).) Under the Plan, Hartford has the "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy…where the interpretation of The Policy is governed by [ERISA]." (Martin 000060 (Docket No. 17-3).)

Martin filed a claim on or around December 26, 2008, for policy benefits following her husband's death. In her claim, Martin stated that Decedent died as a result of "accidental electrocution in home work area." (Martin 000326–333 (Docket Nos. 17-8 & 17-9).) On January 8, 2009, Hartford advised Martin that she, as Decedent's sole beneficiary, would be paid $162,000.00, the full benefit amount of the Basic and Supplemental Life Plans, but that her claim for Accidental Death & Dismemberment ("AD&D") benefits was still pending and that Hartford was in the process of obtaining additional information about the circumstances of Decedent's death.

---

[1] Defendant's exhibits consist of Bates stamped pages attached as exhibits to the Declaration of Edna R. Golych (Docket No. 17), an Appeals Specialist for Hartford Life Insurance Company. Due to the limitations of the Court's electronic case filing system, the exhibits are broken into several parts and the Court will reference the docket number for each part in its citations to the Bates numbered pages.

On March 9, 2009, Martin sent the following documents to Hartford in support of her AD&D claim: (1) a Monroe County Incident Report dated December 13, 2008; (2) a Monroe County Supplemental Report dated December 18, 2008; (3) the Monroe County Sheriff's Office Technical Service Report; (4) the Medical Examiner's ("ME") report; and (5) a toxicology report. (Martin 000084–96 (Docket No. 17-4).) The Monroe County Incident report filed by Investigator S. Okocowicz (referred to in the report as "R/I"), stated in pertinent part the following:

> 0857H: R/I and [Officer] Roland were dispatched to 74 Village Walk for a 35 year old male, diabetic and turning blue. An OEC[2] update prior to arrival stated the male was not breathing, and CPR was in progress. Upon our arrival, Spencerport Ambulance was on scene. We went to the basement of the residence to assist SVA [Spencerport Volunteer Ambulance]. The victim was found to be naked from the waist down, and SVA was performing CPR. The (V), Paul Martin, was laying half way inside a Ham Radio work space. Due to the confined space, the (V) was pulled out to the main basement floor. R/I assisted with CPR efforts while Ofc. Roland did a preliminary interview of the (V)'s wife, Amanda. Ofc. Roland learned that when Amanda found Paul, he was laying face down on the basement floor, with wires wrapped around his arm. She then turned him over and received an electrical shock in the process. She then removed the wires and [s]he threw the wires on the workbench and started CPR as instructed by the OEC dispatcher. With this information, all emergency personnelle [sic] were instructed to stay away from the workbench due to a possible electrical hazard at the time. Spencerport Fire Department members had also arrived by this time and life saving measures were continued. As I was assisting with CPR, I noted several burn marks on the (V)'s hands. They appeared to be thin elongated burn marks across his fingers and hands. After an extended period of time, all life saving measures attempted had failed. The (V) was showed [sic] no signs of life, and the Paramedic was advised by the

[2]This abbreviation is not defined in the report, but possibly refers to Monroe County's Emergency Communications dispatcher, commonly referred to as the 9-1-1 Center. *See*, *e.g.* Town of Hamlin Emergency Plan (Feb. 9, 2007) (*available at* www.hamlinny.org/pdf/fire-marshal/Hamlin-Disaster-Plan.pdf), at 33 ("The driver will notify the Office of Emergency Communications (OEC) of his exact location, number of 2 [sic] casualities, and request for additional units if needed. All area hospitals will be alerted to the situation by the OEC dispatcher."), *and* 9-1-1 Emergency Communications Department (ECD) (available at http://www.monroecounty.gov/safety-ecd.php).

hospital to cease life saving efforts. The family was notified by on-scene first responders.

R/I checked the workbench and found a homemade wire device. It had a black power cord plugged into a regular home power strip. The power cord had been cut, and purple wires were soldered on. One of the purple wires had a soldered bare “loop” on one end and the other end had a soldered “handle.” In the center where the wires came together, another soldered wire was noted that when touched to the purpose wires, sent electrical current through the wires. Spencerport Fireman, Mike Magin, was on scene. He is an electrician by trade and checked the device. It was determined to still be “live” using a multi-meter. The device was left until the Police technician could photograph it.

MCSO Technician Robert Benedict (547B) responded to the scene. Photographs of the electric device were taken where it was found on the workbench. R/I then unplugged the device for follow-up photographs. Photographs were also taken of the burn marks around the testicle region. See Technician Benedict’s reports for further details.

Monroe County Medical Examiner Investigator Kevin McCoy arrived at the scene. He pronounced the victim @ 1050H. Photographs were taken by the Investigator. Preliminary investigation indicated the victim had made the electrical device himself. It appears the loop end of the purple wire was attached around the victim’s scrotum. The other purple wire “handle” end was held in the victim’s hand, and the center “live” wire appeared to be a possible switch, which was held in his other hand. It appears the victim accidentally electrocuted himself to death with this device. The ME’s Office removed the body from the residence for an autopsy.

R/I interviewed the victims [sic] wife, Amanda Martin. She indicated no problems in the marriage. She said the victim suffers from hypertension and diabetes. Because of this, the victim suffers from erectile dysfunction. Medications noted with the victims [sic] name on the bottles are: Enalapril malcate 5mg, Gabapentin 10 mg, Glyburide 5mg, Levitra 10 mg, Januvia 100 mg & Insulin. R/I asked Amanda if the (V) used pornography, or if he engaged in auto erotic stimulation. She indicated no for both questions. She reiterated that when she found Paul, the wires were wrapped around his hands. She indicated he was naked from the waist down, and didn’t know why he would be. She said that when she removed the wires she got an electric shock. She was not injured. Amanda did not know what the device was, but indicated that Paul was an electrical engineer for KMS instruments in Henrietta.

R/I secured the wire device and victims [sic] underwear (which were on the floor by the workbench). R/I took photographs of the wire at the Police Department. R/I downloaded the images to CD-R. All items were placed into

> property custody. R/I will be in contact with ME's Office for the cause of death.
>
> Note: R/I obtained permission to look in the victims [sic] upstairs closet for further investigation, as Amanda said she rarely goes in it. R/I did locate a drawing of interest. It contains a fantasy type image of a female dominatrix and a man bonded by a chain to the ceiling. Technician Benedict photographed the drawing.

(Martin 000085–87 (Docket No. 17-4).). In a December 14, 2008, "Case Summary Report," the Medical Examiner identified Decedent's cause of death as electrocution and manner of death as accident. In the final findings section of the report, the Medical Examiner noted a "[h]istory of contact with electrical current" and the presence of "[e]lectrical burns on right forearm and left hand, penis and adjacent thighs." (Martin 000092 (Docket No. 17-4).)

The Monroe County Sheriff's Office Technical Services Report, completed by R.D. Benedict, provided the following additional information concerning Decedent's death:

> It appears that the harness was made of a small loop of wire that was connected to a live exposed wire with flex ties, and that when the live wire was touched to the exposed wire the circuit was completed and a current was sent to the loop. The victim had several small burn marks on the fingertips of his left finger and middle finger, as well as several burn marks on the inside of his right forearm. The width of the burn marks were consistent with the diameter of the exposed wires. Upon the arrival of the Medical Examiner, more close up photos of the victims [sic] genital area were taken that showed what appears to be a slight burn to the victims [sic] scrotum directly circling the victims [sic] penis. The size of the burn appears consistent with the diameter of the loop attached to the exposed wires, leading all to the assumption that the victim was partaking in some sort of Auto-erotic activity prior to his death.

(Martin 000089 (Docket No. 17-4).)

In a May 15, 2009, letter, Hartford advised Martin that it had determined that Decedent's death was the result of "an injury which was caused or contributed to by a specific exclusion from coverage." (Martin 000292 (Docket No. 17-8).) Hartford denied Martin's AD&D claim. On August 3, 2009, Martin's counsel submitted an administrative

appeal of Hartford's determination. In Martin's affidavit, submitted in support of the appeal, and in Martin's counsel's letter, the following information was provided with regard to the events leading to Decedent's death:

> On Friday, December 12, 2008, Mr. Martin bought food for an elaborate family dinner. That dinner gave Mrs. Martin stomach problems during the night. In the morning of December 13, 2008, Mrs. Martin remained in the bedroom because of her stomach problem, and Mr. Martin brought his daughter, Chloe, downstairs to their living room. Mr. Martin's mother was coming over to their home that morning. They had pre-arranged to go out to breakfast together and then to a craft show at a local elementary school.
>
> So, at this time, Mrs. Martin was upstairs in the bedroom, Chloe was on the main floor of their home, in the living room, and Mr. Martin's mother was expected shortly for all of them to go out to breakfast and the craft show. Mrs. Martin assumed her husband was with Chloe.
>
> When Mrs. Martin went downstairs to the living room, she saw Chloe, but Mr. Martin was not there. She went to the basement to look for him and found him lying on the basement floor, on his stomach, part way into the Ham Radio room, naked from the waist down, with wires attached to him. She received an electrical shock by touching the wires, but was able to throw them away. Her concern was that her husband was not breathing and she tried rescue breathing CPR on the phone with 911.

(Martin 000284–85 (Docket No. 17-8).)

Martin's counsel argued in the administrative appeal that Decedent's death was due to auto-erotic electrocution and was accidental because "[s]omething out of the usual manner of conducting the auto-erotic sexual practice happened and caused his death." (Martin 000285 (Docket No. 17-8).) Martin's counsel further argued in the administrative appeal that Decedent certainly did not intend to cause his own death and that the electrical burns "that were found on [Decedent's] body at the time of his death" were not intentional, since "when performed as intended," Decedent's auto-erotic practice would not cause burns, which, he further argued, Martin would have noticed "had they been there from prior times that [Decedent] performed this practice." (Martin 000286 (Docket No. 17-8).)

Martin's counsel analogized Decedent's burns to the scrapes and scratches that a rock climber receives when engaging in his hobby and asked whether anyone would say that the rock climber's death from an accidental fall while climbing was "'caused or contributed by an intentionally self-inflicted injury,' of scrapes and scratched [sic], because in the past practice in rock climbing, he had suffered this type of injury?" (*Id*.) Martin's counsel cited to *Critchlow v. First Unum Life Ins. Co. of America*, 378 F.3d 246 (2d Cir. 2003), stating it was "the lead case involving ERISA benefit plans as it applies to this exclusion clause in an accidental death policy..." (Martin 000286 (Docket No. 17-8).) He also submitted the following documents in his August 3, 2009, administrative appeal:

Police Incident report of December 13, 2008 and supplemental reports;

Autopsy and toxicology reports including final findings;

Death Certificate;

Paul Martin's obituary from The Caledonia-Record;

Affidavit of Amanda D. Martin and 4 photographs;

CD of police images;

Report of Stephen J. Hucker, MB, BS, FRCPC, FRCPsych and his curriculum vitae;

*Critchlow v. First Unum Life Insurance Co. of America*, 378 F.3d 246 (2d Cir. 2003); and

Obituary of John Bachar (The Economist July 18, 2009).

(Martin 000284 (Docket No. 17-8).)

Additionally, Martin' counsel submitted a July 31, 2009, report from Dr. Hucker, a forensic psychiatrist. Dr. Hucker's report indicated that he based his conclusions on:

i) "Deposition" of Amanda D. Martin, wife of the deceased;

ii) Death certificate pertaining to Paul A. Martin;

iii) Paul Martin's obituary in The Caledonia Record;

iv) Medical Examiner's report;

v) Police incident report;

vi) CD of police photographs of the death scene;

vii) Letter from Irving Pheterson to Ms. Destromp;

viii) Copy of appellate court decision in *Critchlow v. First UNUM Insurance Company of America*, 378 F. 3d 246 (2d Cir. 2003); and

ix) Telephone interview with Martin.

(Martin 000206–212 (Docket No. 17-6).) Dr. Hucker's report included the following background on autoerotic electrocution:

> The use of electrical stimulation to produce sexual excitement and orgasm has been known since at least the nineteenth century. There are currently a number of commercially produced devices for this same purpose. It is not surprising that individuals with professional knowledge of electricity should turn their expertise to construction of homemade stimulating devices. Many of those who have died during erotic electrical stimulation have in fact been so experienced. Clearly their intention is to use the instrument repeatedly for sexual enjoyment and not to end their lives. It is likely that the professional knowledge reinforces the subjective perception that they "know what they are doing."
>
> Death during auto-erotic activity involving electricity is an example of a non-asphyxial or "atypical" autoerotic death (the asphyxial variety is far commoner and therefore characterized as "typical"). In the classic FBI study, Auto-erotic Fatalities (Hazelwood, Dietz and Burgess, 1983), there were 132 "typical" or asphyxial deaths and 16 of the "atypical" cases. The first case of autoerotic electrocution was reported in 1939 and there have been a number of other reports in the literature since then. Thus, unintentional death due to the use of electrical sexual stimulation is well established. Some have referred to these as cases of "electrophilia."

(Martin 000209–10 (Docket No. 17-6).) Dr. Hucker concluded:

> 1. The position that Mr. Paul A. Martin died as a result of autoerotic electrocution is consistent, in my opinion, with the circumstances of his death and what is known of the phenomenon in general.
>
> 2. There is nothing in the evidence that I have reviewed to suggest that Mr. Martin was suffering from any mental disorder. It seems likely that he had primarily manifested the paraphilias (*i.e.* sexual deviation or anomaly) known as Sexual Masochism and Transvestic Fetishism, and that he had been

> engaging in the behaviour for at least two years and likely longer. Although he showed prominent obsessive compulsive personality traits, there was no psychiatric disorder present that would have affected his awareness of what he was doing when he initiated his autoerotic behaviors prior to his death. Further, there was no alcohol or drug reported in his bloodstream at the time of his death that would have substantially have impaired his ability to appreciate what he was doing.
>
> 3. The information I reviewed indicates that Mr. Martin was, in. all other respects, a reasonably normal, well functioning individual with a happy family environment and successful professional life. His wife did indicate that they were frustrated by his erectile dysfunction and their thwarted desire to enlarge their family. Also, although the death of his father had affected him deeply, there is no evidence that he was chronically depressed and indeed he was looking forward to the future including a family breakfast and outing later in the day. There was no suicide note. In my opinion, there is no evidence to suggest that Mr. Martin deliberately intended to take his own life, and the investigators clearly did not think that he had committed suicide.
>
> 4. In the hands of a skilled an experienced and knowledgeable person electrical stimulation of the body for sexual purposes does not, in my opinion, invariably lead to death or injury. Mr. Martin likely died of cardiac arrhythmia or arrest due to electrocution. In my opinion, he would not have intended that his practice end his life and be would have been anticipating future similar sessions for sexual enjoyment. He would not have intended to cause electrical burns during sexual stimulation.
>
> 5. In my opinion, therefore, Mr. Martin had fully expected to survive his autoerotic activities.
>
> 6. This expectation would have also been subjectively reasonable, based on his likely experience of having survived similar escapades in the past, and was objectively reasonable based on the knowledge that autoerotic episodes do not, inevitably, or even substantially likely, lead to a fatal outcome.

(Martin 000211–12 (Docket No. 17-6).)

## STANDARDS OF LAW

The standard for granting summary judgment is well established. Summary judgment may not be granted unless “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in

favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

## ANALYSIS

***Motion to Strike***

Hartford has moved to strike paragraphs 3–79 of Irving Pheterson, Esq.'s Affidavit on Motion for Summary Judgment on Behalf of Plaintiff (Docket No. 13) and exhibits C through U[3] attached thereto. The rule for summary judgment requires that

> [a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is

---

[3] In its Reply memorandum of law (Docket No. 29), at 1 n. 1, Hartford explains that contrary to its original moving papers (Docket No. 24) and supporting memorandum (Docket No. 25), which asked the Court to strike only Exhibits C through U, Hartford made clear in its original memorandum that it sought to have the Court strike all the exhibits associated with the paragraphs of the affidavit which it also seeks to strike.

> referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.

Fed. R. Civ. P. 56(e). Hartford argues that Docket No. 13, paragraphs 3–79, and the associated exhibits, are made by an attorney without personal knowledge, contain legal argument instead of factual statements, and that the exhibits are not properly authenticated as required by Federal Rule of Evidence 901(a), which provides in pertinent part as follows: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Martin responds that "[e]xcept for Exhibit "H" (the appeal denial of Hartford), and Exhibits "R" through "U," all of the other exhibits to which defendant object [sic] were part of the appeal to Hartford submitted by plaintiff's attorney, Irving Pheterson who had personal knowledge that those exhibits had been submitted to Hartford as part of the appeal." (Martin Reply Mem. of Law (Docket No. 27), at 9.) As for the legal arguments, Martin's response is that, "[b]ecause of their relevance to the issues of this case, the paragraphs of Irving Pheterson's affidavit of which defendant objects, are made a part of this law memorandum as fully as though set forth herein at length, so that they may be considered by the Court in the event that the Court does strike those paragraphs which offend the defendant."

The Court will strike the unauthenticated exhibits, R through U, attached to the Pheterson affidavit, and paragraphs 3–79 of the affidavit. Although Mr. Pheterson states in his opening paragraph that he is "fully familiar with the facts and circumstances in connection with this matter," he does not state that he is making the assertions in

paragraphs three through 79 on the basis of personal knowledge, as required by Federal Rule of Civil Procedure 56(e).

***Motions for Summary Judgment***

The decision whether to grant either motion for summary judgment depends on whether Hartford's decision was arbitrary and capricious. Martin brings this action to recover benefits pursuant to 29 U.S.C. § 1132. With respect to this statute, it is well settled that:

> [A] denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed [by a district court] under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan does grant discretion to the administrator, a court "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir.1995).

*Tocker v. Philip Morris Companies, Inc.*, 470 F.3d 481, 487 (2d Cir. 2006). Under the arbitrary and capricious standard, the Court must uphold the administrator's decision unless it is "without reason or erroneous as a matter of law," and "[w]here the plan participant and the plan administrator offer "two competing yet reasonable interpretations of [the plan]," [the Court] must accept that offered by the administrators." *Id*. at 489 (citations omitted); *see also, Miller v. United Welfare Fund*, 72 F.3d 1066, 1070 (2d Cir. 1995) ("The court may reverse only if the fiduciary's decision was arbitrary and capricious, that is without reason, unsupported by substantial evidence or erroneous as a matter of law.") (citation and internal quotation marks omitted). Substantial evidence "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and requires more than a scintilla but less than a preponderance." *Id*. at 1072 (citation and internal quotation marks omitted).

In situations "where (as here) the plan administrator is not the employer itself but rather a professional insurance company," "for ERISA purposes a conflict [of interest] exists." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). When such a conflict exists, "reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits," although, "the significance of the factor will depend upon the circumstances of the particular case." *Id*. at 2346.

Courts "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience," and ambiguities in the language of ERISA insurance plans "are to be construed against the insurer." *Critchlow v. First Unum Life Insur. Co. of America*, 378 F.3d 246, 256 (2d Cir. 2004). Exclusionary clauses in insurance policies "should be read narrowly rather than expansively," and "the insurer has the burden of proving that an exclusion applies." *Id*. (citations omitted).

In conducting a review using the arbitrary and capricious standard, the Court is limited to the record that was before the plan administrator. *Miller v. United Welfare Fund*, 72 F.3d at 1071 ("We follow the majority of our sister circuits in concluding that a district court's review under the arbitrary and capricious standard is limited to the administrative record."). In the instant case, all parties agree that the Court must apply the arbitrary and capricious standard of review. Accordingly, the Court will only consider materials that were before Defendant when it rendered its decision.

Martin argues that because Hartford's Appeal Specialist ignored the conclusions of Martin's expert, Professor Hucker, and failed to ask for an opinion from a similarly qualified expert in the field of autoerotic sexual practices, the Court should conclude that the Appeal

Specialist was "so beholden to Hartford," that she was unwilling to determine the true facts. (Pl's. Mem. of Law (Docket No. 13-23), at 8.) Plaintiff further contends that,

> There is no question that Mr. Martin miscalculated in some fashion, which lead to his death. The evidence is also very clear that he had practiced this autoerotic act for some length of time prior to December 13,2008 without mishap. Clearly, the miscalculation or some mistake he made in his practice lead to the unintended injury which caused his death. But the "injury" occurred after the accident or mishap, and was not an "intentional self-inflicted injury"; rather the result of the mishap.

(*Id.*, at 12.) Hartford counters,

> The administrative record documents that on December 13, 2008, Decedent intentionally applied a home-made electrical device, that was plugged into a live electric wall socket in his home, directly to his genitalia, in an effort to administer an electrical shock for sexual gratification. As a direct result of this intentional and self-inflicted activity, Decedent died from electrocution. It is respectfully submitted that this behavior represents the epitome of an accidental death that was caused or contributed to by an intentionally self-inflicted injury, and therefore, under the unambiguous terms of the Plan, Decedent's death was not a covered loss.

(Def.'s Mem. of Law (Docket No. 19), at 12.) The question becomes whether Decedent intended to injure himself when he applied household current to his body through his homemade wire and switch device. Is an electric shock, from household current, considered an injury? In *Consumers Union of United States, Inc. v. Consumer Product Safety Com.*, 491 F.2d 810 (2d Cir. 1974), the Court of Appeals addressed the question of whether regulations of the Food and Drug Administration pertaining to standards for electrically operated toys and other electrically operated articles intended for use by children were arbitrary and capricious. The Court of Appeals concluded that,

> our careful examination of the record satisfies us that the regulations were promulgated on the basis of an adequate administrative record indicating that the Commissioner fairly considered, among other things, pertinent aspects of *electrical shock hazards*, thermal injury hazards and cautionary labeling.

*Id.*, at 812 (emphasis added); *see also McFann v. Southwestern Power Elec. Company/AEP*, 916 So. 2d 1277, 1284 (La.App. 2 Cir. Dec. 14, 2005) ("That electricity is dangerous is common knowledge even for a 14-year old."); *De Vizio v. Hobart Corp.*, 142 A.D.2d 508, 510 (N.Y. App. Div. 1st Dep't 1988) (Plaintiff "injured by an electric shock suffered in the course of connecting the plugs."). The United States National Institutes of Health's Web site, http://www.nim.nih.gov/medlineplus/, has an article titled "Electrical injury" which contains the following:

> An electrical injury can occur to the skin or internal organs when a person is directly exposed to an electrical current.
>
> Considerations
>
> The human body is a good conductor of electricity. Direct contact with electrical current can be fatal. While some electrical burns look minor, there still may be serious internal damage, especially to the heart, muscles, or brain.
>
> About 1,000 people die of elecrtric [sic] shock each year in the United States.
>
> The affect of an electric shock on an individual depends on the intensity of the voltage to which the person was exposed, the route the current took through the body, the persons's state of health, and the speed and adequacy of treatment.
>
> Electric current can cause injury in three main ways:
>
> * Cardiac arrest due to the electrical effect on the heart
>
> * Muscle, nerve, and tissue destruction from a current passing through the body
>
> * Thermal burns from contact with the electrical source

"Electrical Injury," MedlinePlus, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000053.htm (last accessed Feb. 23, 2011).

Dr. Hucker wrote in his report that Decedent, "primarily manifested the paraphilias (*i.e.* sexual deviation or anomaly) known as Sexual Masochism and Transvestic Fetishism,

and the he had been engaging in the behaviour [sic] for at least two years and likely longer." (Martin 000211.) Dr. Hucker did not provide the factual basis for his conclusion that Decedent had engaged in electrical shock stimulation on any previous occasion. Dr. Hucker did conclude, based on his expertise, that Decedent practiced Sexual Masochism. According to the Merck Manual of Diagnosis and Therapy, masochism is defined as, "[i]ntentional participation in an activity in which one is humiliated, beaten, bound, or otherwise abused to experience sexual excitement." Merck Manual (7th ed.), at 1563. It continues,

> Masochistic fantasies tend to begin in childhood.... Masochistic activity tends to be ritualized and chronic. For most practitioners, the humiliation and beating are simply acted out in fantasy, with participants knowing that it is a game and carefully avoiding actual humiliation or injury. However, some masochists increase the severity of their activity as time goes on, potentially leading to serious injury or death.... Persons may act on their masochistic fantasies themselves (*e.g.*, binding themselves, piercing their skin, applying electrical shocks, burning themselves) or see out a partner who may be a sexual sadist.

*Id*. The Court is aware of the careful distinction that is necessary between the intended act and the resulting death. In *Critchlow*, the Second Circuit reversed the district court, which found that strangulation was *per se* injurious. The Second Circuit reasoned that the plaintiff in that case, who died after practicing autoerotic partial asphyxiation, was not intending to strangle himself. It then wrote:

> To the extent that the [district] court instead meant to endorse the proposition that "'*partial* strangulation is an injury in and of itself,'" 198 F. Supp. 2d at 323 (quoting *Sims*, 960 F.2d at 480 (emphasis ours)), the court ignored, *inter alia*, the fact that Critchlow's death was not caused by "partial" strangulation but by the total loss of oxygen for a sustained period. To the extent that the district court here adopted the view that partial strangulation is an injury in and of itself, it ignored the apparently well-accepted medical and scientific views that the physiological effects of partial strangulation without loss of consciousness—absent an accident—are a temporary

> lightheadedness and euphoria with no serious or lasting adverse impact on one's health, *see Padfield*, 290 F.3d at 1126, and that autoerotic asphyxiation is not likely to result in death, *id*. at 1127 ("uniform medical and behavioral science evidence indicates that autoerotic activity ordinarily has a nonfatal outcome").

*Critchlow*, 378 F.3d at 260.

The human body can be injured with as little as two-tenths of an ampere of current, because it can make the heart fibrillate. John D. Cutnell & Kenneth Johnson, Physics (4th ed.) 1988.[4] It is common knowledge that household electrical circuits typically have circuit breakers or fuses that will allow up to fifteen amperes of current to pass before they cut off the flow.

> A narrow range exists between perceptible current and the "let go" current—the maximum current at which a person can grasp the current and then release it before muscle tetany makes letting go impossible. The "let go" current for the average child is 3-5 mA; this is well below the 15–30 A of common household circuit breakers. For adults, the "let go" current is 6–9 mA, slightly higher for men than for women. Skeletal muscle tetany occurs at 16–20 mA. Ventricular fibrillation can occur at currents of 50-100 mA.

Tracy A. Cushing, MD, MPH & Ronald K. Wright, MD, JD,[5] "Electrical Injuries (*available at* http://emedicine.medscape.com/article/770179-overview, last checked Sept. 29, 2010). If,

---

[4] http://hypertextbook.com/facts/2000/JackHsu.shtml ("An interesting fact to note is that it takes less alternating current (AC) to do the same damage as direct current (DC). AC will cause muscles to contract, and if the current were high enough, one would not be able to let go of whatever is causing the current coursing through the body. The cut-off value for this is known as the "let-go current". For women, it is typically 5 to 7 milliamperes, and for men, typically 7 to 9 milliamperes. This is dependent on the muscle mass of the individual.

In general, current that is fatal to humans ranges from 0.06 A to 0.07 A, depending on the person and the type of current.").

[5] Tracy A. Cushing, MD, MPH, is an Instructor in Medicine, Department of Emergency Medicine, Harvard Medical School; Attending Physician, Department of Emergency Medicine, Mount Auburn Hospital; coauthor Ronald K. Wright, MD, JD, is a retired Associate Professor, Department of Pathology, University of Miami School of Medicine; Private Practice, Forensic Pathology.

as Martin's expert states, Decedent was practicing sexual masochism by giving himself an electric shock with household current, and died during the process of shocking himself, then Hartford's conclusion that the exclusion applies was not an arbitrary and capricious decision.

**CONCLUSION**

Hartford's motion to strike (Docket No. 24) and cross-motion for summary judgment (Docket No. 15), are granted, and Martin's motion (Docket No. 13) for summary judgment is denied. The Clerk is directed to enter judgment for Defendant and close this case.

IT IS SO ORDERED.

Dated: March 15, 2011
Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge